FILED

2016 Aug-16  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **JGB, LLC, a limited liability company,** | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **Case No.: 4:15-CV-998-VEH** ) |
| **ARGOS CEMENT, LLC, a limited liability company,** | ) ) ) |
| **Defendant.** | ) ) |

---

## <u>MEMORANDUM OPINION</u>

This civil action was filed on June 15, 2015, by the Plaintiff, JGB, LLC ("JGB"), against the Defendant, Argos Cement, LLC ("Argos"). (Doc. 1 ). The First Amended Complaint alleges that Argos breached two separate mining contracts with JGB. (Doc. 14). The case comes before the Court on the Defendant's Motion for Summary Judgment. (Doc. 27). For the reasons stated herein, the motion will be **GRANTED**.

## I.   STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2)

3

proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   FACTS

### A.   The Parties and Their Business Relationship

Argos operates a cement manufacturing facility in Calera, Alabama. Don Collier is the purchasing manager for Argos. (Doc. 27-2 at 5(15)). In his deposition, Collier described his job responsibilities as "[p]rocurement of goods and services to support the manufacturing facility." (Doc. 27-2 at 5(16)). Collier originally drafted the contracts at issue in this case. (Doc. 27-2 at 7(23)). David Bremer is the U.S. cement manufacturing quarry and mining manager for Argos. (Doc. 27-10 at 5(14)). In 2013, he was the quarry manager for Argos. (Doc. 27-10 at 5(15); doc. 27-11 at 2).

JGB is an excavating company which performs mining work. The company

was established in 2001, and has performed various work for Argos (and its predecessor in interest) since 2003. JGB's managing member/sole owner is Jim Bockman. Tim Blankenship was employed as JGB's managing agent during his entire time with the company.

The business conducted between Argos and JGB was principally governed by two contracts—a clay mining contract and a quarry stripping contract. The contracts were originally between Lafarge North America, Inc. ("Lafarge") and JGB. Argos subsequently acquired Lafarge's facility, and the clay mining and quarry stripping contracts were assigned to Argos.

**B.    The Clay Mining Contract**

Lafarge and JGB originally entered into the clay mining contract on January 1, 2009. Donald Collier signed the clay mining contract on behalf of Lafarge. Blankenship, as JGB's managing agent, signed the clay mining contract on behalf of JGB. Pursuant to the clay mining contract, JGB was required to remove clay from Argos' clay pit and haul it to the clay stockpile area.

The clay mining contract had a term of "January 1, 2009, through December 31, 2010, with Year-to-Year renewal options." (Doc. 14 at 9). On April 22, 2010, the clay mining contract was revised by mutual agreement of the parties. Collier signed the revised clay mining contract on behalf of Lafarge. Blankenship, as was the case

with the original contract, signed the revised clay mining contract on behalf of JGB. The revised clay mining contract carried forward the same term as the original contract of "January 1, 2009, through December 31, 2010, with Year-to-Year renewal options." (Doc. 27-4 at 2). The parties agree that, pursuant to this provision, the contract required mutual agreement before the clay mining contract would be renewed. The parties also agree that there is no language specifying how renewals are to be exercised.

On or about May 12, 2011, Lafarge entered into an agreement with Argos providing for the acquisition by Argos of the cement and ready mix business of Lafarge in the Southeastern United States. JGB's contract with Lafarge was assigned to Argos with the consent of JGB. It is undisputed that the parties mutually agreed to exercise the renewal option under the clay mining contract <u>at least</u> for the period between 2011 through 2013.[1] In the following exchange from Collier's deposition, he explains how the contracts were renewed:

> Q.     Okay. And you say as we agreed it renewed. Did anybody do anything to renew this contract?
>
> A.     No, sir.
>
> Q.     In other words, this contract automatically renewed?

---

[1] The parties dispute whether it was renewed thereafter.

. . .

A.      As we mutually agreed.

Q.      . . . Well, what I'm getting at is nobody took any action in 2011, the contract continued?

A.      Correct.

Q.      Same thing for 2012?

A.      Correct.

Q.      Same thing for 2013?

A.      Correct.

Q.      And you didn't have to call Mr. Bockman and say, Mr. Bockman, the contract's, good we're fine with it. He didn't have to call y'all; it just renewed?

A.      Correct.

(Doc. 27-2 at 17(63-64)).

It is undisputed that, in the Fall of 2013, Argos decided it was not going to renew the clay mining contract for 2014. (Doc. 27-1 at 6, ¶18 (Defendant's proffered fact); doc. 32 at 7, ¶18 (Plaintiff's response does not dispute)).[2] Instead, they had

---

[2] JGB proffers, without citation to the record:

15.      In fact, there was a valid 2014 Clay Mining Contract.

(Doc. 32 at 12, ¶15).  This conclusory, unsupported fact, which goes to the ultimate issue in the case, will not be included.  Similarly, JGB also proffers:

decided to open the contract up to bids.

Blankenship was initially informed about Argos placing the clay mining contract out to bid during a September 2013 meeting with David Bremer. (Doc. 27-10 at 5((14-15)). On October 7, 2013, Bremer met with both Blankenship and Bockman, and it was again communicated that the clay mining contract would be going out for bid. (Doc. 27-11 at 2, ¶4).

On another occasion, after October 7, but before December 3, 2013, Collier verbally told Blankenship that Argos was putting the clay mining contract out for bid and informed him of the pre-bid meeting being held on December 9, 2013. (Doc. 27-2 at 31(120)-32(121)). On December 3, 2013, Collier sent Blankenship an email which stated: "Tim, as discussed I am forwarding the information regarding the pre-bid meeting scheduled for 12/9/2013 at 10:30 a.m. at the quarry office." (Doc. 27-12 at 2). Attached to the email was a "Request for Quotation" which, among other things, gave the date of the December 9, 2013, information meeting, the dates that bids would be requested and should be returned, and noted that the contract would be awarded on December 20, 2013. (Doc. 27-12 at 3). It also stated: "You are invited to

---

16.    During the one-year renewal term of the 2013 Clay Mining Contract, JGB exercised its renewal option according to paragraph 1 of the Contract. (Lafarge Clay Mining Contract/Master Agreement; Ex. "E").

(Doc. 32 at 13, ¶16).  JGB's citation to the agreement alone does not prove that it "exercised its renewal option."  This fact will not be included.

8

submit a quotation to the ARGOS Roberta Cement Quarry, Alabama USA – 2014 Clay stripping, *no later than **12/18/2013, 12:00 (Central Time)***." (Doc. 27-12 at 3; *see also*, doc. 27-12 at 4 ("You are invited to bid for Clay mining at the Roberta Meadowood and Red Little Tract Clay/stripping sites near[] Roberta, Alabama[.]")) (italics and bold in original). The document also included various specifics regarding the job and site, and how bids should be made. (Doc. 27-12 at 3-9). Blankenship was out-of-town on December 3, 2013, but received Argos' e-mail concerning the request for bids a couple of days later when he returned home.

After receiving the bid materials from Argos, and before the December 9 bid meeting, Blankenship discussed with Bockman the fact that Argos was soliciting bids for clay mining services in 2014. (Doc. 27-3 at 14(52)-15(53)); doc. 27-9 at 18(66-67)); doc. 27-11 at 3, ¶ 5).[3] Blankenship and Bockman then both attended the pre-bid

---

[3] The facts in this sentence were proffered by Argos. (Doc. 27-1 at 7-8, ¶24). JGB generally disputes the facts in this sentence and several others in one paragraph of its brief. (*See*, doc. 32 at 7, generally disputing Defendant's proffered facts numbers 24-28). This Court's Uniform Initial Order, entered in this case on June 16, 2015, provides:

> The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 4 at 17) (emphasis in original). This is the second time that this Court has brought this

meeting along with one of JGB's supervisors. (Doc. 27-3 at 17(63)-(64), 18(65)).

Bockman agreed that, at this meeting, representatives from Argos explained that the

clay mining contract was being put out for bid. (Doc. 27-9 at 19(72)).

In Blankenship's deposition, the following exchange took place:

Q.     So as of December 9th, were you aware that Argos was going to
go forward with putting the clay mining contract out to bid?

A.     Yes.

(Doc. 27-3 at 17(64)). Elsewhere, in Blankenship's deposition there was this

discussion:

Q.     Were you aware as of the time of this pre-bid meeting that Argos
was going to get somebody to enter into a new contract to mine clay at
the Roberta facility?

A.     On this day, it looked like they were going to.

Q.     Did you have any reason to think they were not going to follow

---

language to the attention of JGB. (*See*, doc. 31, at 1).  The first time was after JGB failed to
dispute any of Argos' proffered statements of fact and the Court allowed JGB a second bite at the
apple.  This time around JGB states, in a footnote, that, "[f]or the court's convenience the
numbered factual paragraphs from the Defendant's Motion for Summary Judgment have been
consolidated."  (Doc. 32 at 7, n. 1).  The Court does not deem such "consolidated" responses to
follow either the letter, or the spirit, of its order.  Further, JGB's statements in response to these
paragraphs do not, for the most part, actually dispute the facts proffered by Argos.  Instead, they
focus on whether, based on the facts proffered by Argos, JGB was aware that the contract would
not be renewed.  Only two of the facts in these paragraphs arguably speak to that issue.  (*See,*
doc. 27-1 at 8, ¶26 ("JGB was therefore aware that Argos was putting the clay mining contract
out to bid and a new contract would be utilized for clay mining services in 2014"); doc. 27-1 at 9,
¶30 ("JGB knew in December 2013 that the clay mining contract would not be renewed for
2014")).  To the extent that facts proffered by Argos are not specifically disputed by JGB, they
have been deemed by the Court to be admitted, and have been included.

through?

A.     Well, we had had a long relationship doing it, and I had no reason to believe that we had had any problems, but here we go. We've got a pre-bid meeting and, I mean, we've seen this happen before and then not anything -- you know, maybe I was being naive.

Q.     But as far as you knew, Argos was going out for bid on this same contract, correct?

A.     Yes. Yes.

(Doc. 27-3 at 18(66-67)). Then, there was this dialogue in Blankenship's deposition:

Q.     In your mind, there had to be some event, there had to be a problem?

A.     Yes. Right.

Q.     Otherwise, it should have been renewed for another year. Is that your view?

A.     That's what they had done for years and years.

Q.     And they had told you in December 2013 they weren't going to do that anymore, right?

A.     Yes.

(Doc. 27-3 at 22(84)-23(85)). Blankenship also testified that he "[h]ad lots of conversations" with people at Argos after the bid meeting. (Doc. 27-3 at 18(67)). He also received a document from Argos, which was prepared by Argos and provided to potential bidders, that answered questions which were asked by potential bidders

following the December 9 meeting. (Doc. 27-3 at 19(72)).

JGB did not bid on the contract. Instead, Bockman, on December 18, 2013,

gave Collier a letter which read:

> JGB, LLC is not participating in Argos['] request for Quotation for the 2014 Red Little Tract Clay Mining and Meadowood Tract Clay Mining. However, the Master Purchase Agreement between Lafarge North America, Inc. and JGB, LLC, dated January 1, 2009, and consented to and assigned to Argos USA around October 2010 contractually controls this process. That Agreement provides that "the period covered by this Agreement shall be January 1, 2009, through December 31, 2010, with year-to-year renewal options[.]"[] It further stipulates that the pricing for these options is specified in Schedule (A) of [that] Agreement. For Calendar years 2011, 2012[,] and 2013 JGB, LLC and Argos orally extended this contract and used Schedule (A) for pricing. Since we have not breached the contract and such contract is not restrictive to any specific area, we believe our renewal option for 2014 should be $3.05 plus annual increase in CPI as published by the U.S. Department of Labor and Argos provides fuel for these projects.

(Doc. 27-15 at 2). Bockman signed the letter as "Managing Member, JGB, LLC."

(Doc. 27-15 at 2).

On December 20, 2013, two days after Collier received Bockman's December

18th letter, Bremen sent Collier an email which stated:

> I will not be back in the office until after the new year. We would need to notify JGB that we aren't going to extend the contract before the year ends or they will have some right to extension. I don't think it can wait until I get back.

(Doc. 29-12 at 1).[4] When asked in his deposition whether this was "what [he] believed on that day," Bremer stated

> I mean, all I can talk about is what was written there. I don't remember. That was a long time ago.
>
> What I do remember in general is that I was trying to get this issue resolved and work my way through it.
>
> And like I said, I'm not purchasing. I'm not a lawyer. I was just trying to get through it knowing how things went in the past with Jim and JGB, and I was just trying to get through.
>
> I mean, what word I chose or what I was trying to do I was trying to convey the message and that's why you see lots of e-mails and me trying to follow up is because I'm saying I just want to make sure this goes through. I mean, and I'm trying to ask the people who can help me with that.

(Doc. 27-10 at 34(129-130)). Bremer added that, with this email, he " was trying to make sure things went as smooth as possible, so I was trying to kick it up to [Collier] and say hey, help me out here, I'm not sure what to do." (Doc. 27-10 at 34(132)).

On January 2, 2013, Collier sent an email to Bockman and Blankenship which read: "Gentlemen, attached is the notification letter form Argos Cement LLC regarding the Roberta Quarry Clay Mining Project." (Doc. 27-16 at 2). Attached to that email was a letter to Bockman's attention, dated December 30, 2013, which stated:

---

[4] There is no evidence that this email was ever forwarded to anyone from JGB.

13

The purpose of this letter is to serve as notification that effective 12/31/2013 Argos Cement LLC will not require the services of JGB, Inc. for the sole purpose of clay mining at the Argos Cement Roberta Plant located in Calera, AL. This termination will be effective 30 days after notification date.

(Doc. 27-16 at 3). The letter was signed by Collier, as the "Purchasing Manager" for

Argos. (Doc. 27-16 at 3).

The clay mining contract contained a "termination" clause which sets out under

what conditions a party to the contract could terminate it. (Doc. 27-4 at 5, ¶19).[5] It is

undisputed that none of those conditions existed in this case. In his deposition, Collier

stated that, despite the phrasing used in his letter, Argos did not "terminate" the

contract, they merely did not renew it. (Doc. 27-2 at 20(73)). He stated that

---

[5] The clause reads:

19.   **Termination**.

In addition to its other remedies at law or equity either party may terminate this Agreement as permitted as follows;

(a)   By written notice to the other party if a material breach has occurred by the other party and such breach has continued without correction for a period of thirty (30) days after receipt of written notice thereof from the terminating party.

By written notice to the other party upon the insolvency, receivership or bankruptcy of the other party, an assignment by the other party for the benefit of its creditors, or the filing of any petition by or against the other party under the Bankruptcy Code as now in force or hereafter amended or under any similar act for the relief of debtors; provided in the case of an involuntary petition against one (1) party, such is not dismissed with thirty (30) days.

(Doc. 27-4 at 5, ¶19) (bold in original).

"termination" was the wrong choice of words. (Doc. 27-2 at 20(75); doc. 27-2 at 20(76)).

## C.   <u>The Quarry Stripping Contract</u>

On or about June 1, 2005, JGB and Lafarge entered into an agreement by which JGB agreed to strip materials at Lafarge's Vulcan Quarry. Stephen Dishman executed the quarry stripping contract for Lafarge. Blankenship signed the quarry stripping contract on behalf of JGB.[6] The stripping of material included the transport of various volumes of material as well as construction of internal access roads and ramps.

The contract originally provided that

> JGB, LLC will strip a yearly yardage (est. at a minimum of 2,000,000 and maximum of 2,500,000 yards per year[)] and will be paid $2.16 per yard[.] The rate of $2.16 is based on a distance of no more than three (3) miles round trip from point of stripping to point of dumping material.

(Doc. 27-7 at 7).

Approximately four years into the relationship, the parties agreed to revise the quarry stripping contract. Collier and Bremer signed the revised quarry stripping contract for Lafarge. Blankenship, as JGB's managing agent, and Bockman, as JGB's managing owner, signed the quarry stripping contract for JGB. The revised quarry

---

[6] The first five pages of this contract are identical to the first five pages of the clay mining contract. Collier testified in his deposition that the provisions in these pages, in each contract, were non-negotiable.  (Doc. 29-6 at 8(30)).  Collier also testified that he could have changed any provisions in either contract, and added a bid provision, but he did not.  (Doc. 29-6 at 8(31-32)).

stripping contract, among other things, replaced the provision setting forth estimated minimum and maximum stripping yardage with a five year schedule of "anticipated estimated stripping volumes." (Doc. 27-5 at 7). The anticipated estimated stripping volumes were long term, future projections of Lafarge's stripping needs. Accordingly, the revised quarry stripping contract obligated Lafarge to provide JGB with a good faith estimate of its planned stripping volume in October of the preceding year. The term extended from June 1, 2005, through May 31, 2015, with year-to-year renewal options. JGB and Lafarge operated pursuant to the terms of the contract from 2005 through part of 2011.

In 2011, JGB's contract with Lafarge was assigned to Argos with the consent of JGB. Thereafter, JGB and Argos operated pursuant to the terms and conditions of the revised quarry stripping contract. On October 7, 2013, Bremer, pursuant to the terms of that agreement, sent Bockman and Blankenship an email containing a good faith estimate for 2014. The email stated that "[b]ased on current 2014 volume forecasts that we have received from our customers, and the associated mine plans, we estimate that we will require 222,554 BCY of material to be moved by JGB, LLC in 2014." (Doc. 27-17 at 2). The e-mail further provided that "[t]his volume may be affected by any excess volume that is mined by JGB in 2013 beyond our original planned stripping area." (Doc. 27-17 at 2). In his deposition, Blankenship agreed that

it was accurate to say that "Argos determined the amount of the stripping that they needed done." (Doc. 27-3 at 26(100)). He also agreed that, although Argos tried to give JGB a good faith estimate of what they needed done, "at the end of the day, based on their needs, Argos determined how much needed to be stripped." (Doc. 27-2 at 27(101)). Blankenship also agreed that JGB got paid for work that was actually done, whether it was more or less than the good faith estimate. (Doc. 27-3 at 27(104)-28(105)).

Using the estimate provided to JGB, Argos issued a purchase order in the amount of $751,030. (Doc. 27-18 at 2; doc. 27-3 at 30(115)). The import of this purchase order is a source of contention. JGB makes no argument that it was not paid for the work it did.[7] Instead, the Plaintiff contends that "JGB was not permitted by Argos to fulfill the entire purchase order, resulting in a shortage to JGB of $287,437.67." (Doc. 32 at 20, ¶50).

Collier also testified that "[w]e only pay for work they completed." (Doc. 27-2 at 30(114)). Collier testified in his deposition that purchase orders "were issued to cover the invoicing process." (Doc. 27-2 at 29(112)). He continued: "They don't necessarily . . . do all the volumes that were on the purchase order. It depended upon

---

[7] It is undisputed that Argos gave JGB timely notice that it would not be renewing this agreement.  Unlike the clay mining contract, in this instance, JGB seeks only the difference between what it was paid, and what the purchase order provided.  (Doc. 32 at 32).

. . . the business directive." (Doc. 27-2 at 30(116)). In his deposition, Blankenship

agreed that "there had to be a purchase order in place so JGB could get paid. . . . If

there [was] no purchase order, there would be no way for [Argos'] accounting people

to process [JGB's] invoices." (Doc. 27-3 at 30(115-116)). Similarly, Bockman

described the purchase order as "just an accounting function to distinction [sic] where

the money goes." (Doc. 27-9 at 29(112)).

## III.   ANALYSIS

### A.   <u>Applicable Law</u>

Both contracts provide that they "shall be construed in accordance with and

governed by the laws of the Commonwealth of Virginia." (Doc. 27-4 at 4; doc. 27-5

at 4). No party argues for the application of any other state's law to these agreements.

### B.   <u>The Clay Mining Contract (Count One)</u>

Count One of the Amended Complaint alleges that Argos

breached the Clay mining Contract . . . by refusing to honor the terms
and conditions of the contract for the calendar year 2014 without
providing JGB with reasonable notice of the termination of the Clay
mining Contract.

(Doc. 14 at 4, ¶19). In Virginia, the elements of a breach of contract action are: "(1)

a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's

violation or breach of that obligation; and (3) injury or damage to the plaintiff caused

by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344, 784 S.E.2d 296, 299 (2016) (internal quotations and citations omitted). Argos argues that it is entitled to summary judgment because it did not renew the clay mining contract for 2014. (Doc. 27-1 at 15). If that is the case, JGB's *prima facie* case fails as it cannot establish that Argos had a "legally enforceable obligation" to JGB.

The Supreme Court of Virginia has noted that "[i]t is elementary that mutuality of assent—the meeting of the minds of the parties—is an essential element of all contracts." *Phillips v. Mazyck*, 273 Va. 630, 636, 643 S.E.2d 172, 175–76 (2007). The requirement of mutual assent also applies to renewals of existing contracts. *Aetna Cas. & Sur. Co. v. Harris*, 218 Va. 571, 575, 239 S.E.2d 84, 86 (1977). In the instant case, it is undisputed that Argos had decided not to renew the contract with JGB for 2014. However, in Virginia, whether a party assented to the terms of a contract should be ascertained "from that party's words or acts, not from his or her unexpressed state of mind." *Phillips*, 643 S.E.2d at 175 (*citing Wells v. Weston*, 229 Va. 72, 78, 326 S.E.2d 672, 676 (1985)). "In evaluating a party's intent . . . we must examine his outward expression rather than his secret, unexpressed intention." *Wells*, 326 S.E.2d at 676.

JGB argues that Argos was required to affirmatively give JGB notice that it was <u>not</u> renewing before the renewal date of January 1, 2014, and that, if did not, the

19

contract automatically renewed.[8] Further, JGB argues that its December 18, 2013, letter to Collier stating that <u>JGB</u> was renewing the agreement required Argos to respond saying that it was not. JGB argues that "the only notice to JGB from Argos that the contract would not be renewed was after the period of renewal." (Doc. 32 at 26) (referring to Collier's "termination" letter attached to the January 2, 2014, email).

First, the contract says nothing about giving "notice" of renewal or non-renewal. Further, JGB cites no provision in the agreement allowing it to unilaterally renew the contract, or requiring Argos to affirmatively state that it is <u>not</u> renewing, even if JGB affirmatively states that <u>it</u> is. Regardless, in his deposition, Blankenship agreed that, despite the fact that for "years and years" Argos had renewed the contract, Argos told JGB "in December 2013 they weren't going to do that anymore." (Doc. 27-3 at 22(84)-23(85)). Accordingly, even <u>if</u> an affirmative "non-renewal" was required, Argos did so.

Also, in the instant case, Argos, through all of its conduct, made it extremely clear that it was not going to renew the agreement for 2014. While there is no provision in the contract explaining how renewal is to be done, and despite there being no "automatic renewal" language in the contract, in previous years neither party

---

[8] This is a strange position for JGB to take when it has acknowledged that "there is no language as to how renewals are to be exercised." (Doc. 32 at 18, ¶40).

took any action regarding renewal or non-renewal, and the agreement merely continued on into the next year. By contrast, as early as September 19, 2013, about three months before the expiration of the contract's 2013 term, Bremer had a meeting with Blankenship and informed him that the contract would be placed out for bid. On October 7, 2013, Blankenship and Bockman both met with Bremer, and Bremer told them that the clay mining contract would be going out for bid. After October 7, 2013, but prior to December 3, 2013, Collier told Blankenship that Argos was putting the clay mining contract out for bid and informed him of the pre-bid meeting being held on December 9, 2013. On December 3, 2013, Argos sent Blankenship, via email, the request for bids for clay mining services. Blankenship and Bockman then both attended the pre-bid meeting along with one of JGB's supervisors, and it was, again, made very clear that the job was being put out to bid. Blankenship testified that, after the bid meeting, he "[h]ad lots of conversations" with people at Argos about the bid. (Doc. 27-3 at 18(67)). After the bid meeting, Blankenship also received a document from Argos, which was prepared by Argos and provided to potential bidders, and which answered questions which were asked by potential bidders following the December 9 meeting. (Doc. 27-3 at 19(72)). Further, representatives from JGB knew that Argos did not mutually assent to the renewal. In his deposition, Blankenship agreed that, as of December 9, 2013, he was "aware that Argos was going to go

forward with putting the clay mining contract out to bid." (Doc. 27-3 at 17(64); *see also*, doc. 27-3 at 18(66-67)). Bockman agreed that, representatives from Argos "explain[ed] to the folks who attended [the December 9, 2013 meeting] that the clay mining contract was being put out for bid." (Doc. 27-9 at 19(72)).[9]

JGB draws the Court's attention to Bremer's December 20, 2013, email to Collier stating that "we need to notify JGB that we aren't going to extend their contract before the year ends or they will have some right to extension." (Doc. 29-12 at 1). It agues that this email demonstrates that Argos "understood its obligations under the contract to timely notify JGB of its intention not to renew the contract prior to December 31, 2013." (Doc. 32 at 22). First, as noted above, Bremer explained in his deposition that he did not mean that the contract would renew if Argos did nothing. (Doc. 27-10 at 34(129-130, 132)). Regardless, Bremer's opinion in his email cannot change the terms of the contact and create an automatic renewal where none

---

[9] JGB argues that "these examples only indicated to JGB that Argos was going to put the contract out for bids, not that Argos would not renew the contract." (Doc. 32 at 25). This argument strains credulity. The "Request for Quotation" sent by Argos to JGB in December of 2013, asked JGB to bid on the contract and noted, among other things, that the contract would be awarded on December 20, 2013. (Doc. 27-12 at 3). If the fact that Argos was taking bids on the work was not incompatible with JGB's contract being renewed, then certainly this language made it clear that a new contract to perform the work was going to be awarded to someone. Further, as noted above, Blankenship admits that he was told, in December of 2013, that the contract was not going to be renewed. JGB cannot avoid reality by merely sticking its head in the sand.

existed before.[10]  Finally, the point is moot since Blankenship admits that, in December 2013, Argos <u>did</u> tell JGB that they were not going to renew the agreement.[11]

JGB argues that the Court should look to the parties' prior dealings to determine their rights under the contract. Argos objects to doing so, citing a provision in the contract which states that the contract's terms "may not be added to, changed, supplemented or explained by alleged prior dealings, usage of trade or course of dealing or performance." (Doc. 33 at 8) (quoting doc. 27-4 at ¶19). The court need not spend much time on this argument since, as noted above, looking at the parties' prior conduct *vis a vis* renewal does not help JGB. In prior years the parties did nothing and the contract renewed. If that is the standard for renewal, it was not followed in the instant case, where Argos not only told Blankenship that they were not renewing the contract, it engaged in conduct demonstrating as much.[12]

---

[10]  JGB argues at length that Collier's "termination" letter, attached to his email of January 2, 2014, was not an effective termination pursuant to the terms of the contract. (Doc. 32 at 22, 26-28, 31). The Court agrees, but, as noted by the Defendant, "Argos is not now claiming, nor was it at the time, that the clay mining contract was terminated in accordance with the termination clause. Argos is saying there was no mutual assent to renew the clay mining contract so there was nothing to terminate because no contract existed." (Doc. 33 at 7).

[11]  JGB states that Argos "argues that there was no mutual assent to renew the Clay Mining contract because the parties just 'didn't get along' or 'didn't like each other[.]'" (Doc. 32 at 23). The Court cannot find such an argument anywhere in Argos' briefs.

[12]  The Court notes that JGB also argues that the phrase "renewal options" in the contract is undefined and ambiguous. Further, it argues that

Because JGB cannot show that there was mutuality of assent to entering into the renewal, it cannot prove that Argos had a legally enforceable obligation to JGB, and its *prima facie* case fails. Summary Judgment is therefore due to be granted in favor of Argos, and against JGB, as to Count One.

## C.    The Quarry Stripping Contract (Count Two)

Count Two of the Amended Complaint alleges that Argos "breached the Vulcan Quarry Stripping Contract by not allowing JGB to fill Argos['] Purchase Order." (Doc. 14 at 6). JGB's underdeveloped argument as this contract cites no authority, cites no contractual provisions referencing purchase orders, and otherwise makes no attempt to explain why it should be paid on the balance of the purchase order.[13]

The purchase order was based on a good faith estimate of Argos' planned stripping volume for 2014. There is no evidence that the purchase order, which was

---

no documents specify whether JGB, Argos, or both possess a renewal option. Likewise [the contract omits] an explanation of how the renewal option should be exercised.  Finally, neither document states when the renewal option must be exercised.

(Doc. 32 at 30).  Even if the Court agreed with JGB, JGB argues only that "it is important to examine the manner [in which] the parties renewed the prior contract since the language on renewals is ambiguous."  (Doc. 32 at 31).  As shown above, doing so does not help JGB.

[13]  To the extent that JGB is arguing some contractual theory based upon reliance, it argues only that it relied on the good faith estimate, not the purchase order, in making its bid. (Doc. 32 at 32).  Even if that were case, JGB fails to explain why it should be entitled to recover because of such reliance.

based on this estimate created some enforceable agreement with JGB. On the contrary, the undisputed evidence is that Argos only pays for work that JGB actually completes. (Doc. 27-2 at 30(114)). Collier testified in his deposition that purchase orders "were issued to cover the invoicing process." (Doc. 27-2 at 29(112)). He explained that JGB "[does not] necessarily . . . do all the volumes that were on the purchase order. It depended upon . . . the business directive." (Doc. 27-2 at 30(116)). Blankenship agreed that "there had to be a purchase order in place so JGB could get paid. . . . If there [was] no purchase order, there would be no way for [Argos'] accounting people to process [JGB's] invoices." (Doc. 27-3 at 30(115-116)). Similarly, Bockman described the purchase order as "just an accounting function to distinction [sic] where the money goes." (Doc. 27-9 at 29(112)).

Because JGB cannot show that the purchase order created a legally enforceable obligation to JGB, its *prima facie* case fails. Summary Judgment is therefore due to be granted in favor of Argos, and against JGB, as to Count Two.

## IV.    CONCLUSION

Based on the foregoing, Argos' Motion for Summary Judgment will be **GRANTED**, and this case will be **DISMISSED with prejudice**. A Final Order will be entered.

**DONE** and **ORDERED** this 16th day of August, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge